**LARA S. MEHRABAN**
**ASSOCIATE REGIONAL DIRECTOR**
Gerald A. Gross
Preethi Krishnamurthy
Eric M. Schmidt
Attorneys for the Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                       **Plaintiff,**<br><br>            -against-<br><br>**WILLIAM WHITE,**<br><br>                       **Defendant.** | **COMPLAINT**<br><br>19 Civ. ___ ( )<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against defendant William White ("White"), alleges as follows:

**SUMMARY**

1. From at least June through November 2016 (the "Relevant Period"), White—then the chief executive officer of Andiamo Corporation ("Andiamo"), a penny stock issuer—arranged for a stock promoter (the "Promoter") to obtain millions of shares of Andiamo stock at a large discount so that the Promoter could make lucrative, manipulative trades and kick back a substantial portion of the profits to White.

2. Specifically, from June through October 2016, after the Promoter told White he planned to engage in pre-arranged matched trading with a buyer (the "Matched Buyer") and agreed to give White half of the Promoter's profits from those trades, White arranged for the Promoter to obtain at least 66 million shares of Andiamo common stock at a significant discount from the market price.

3. From July through November 2016, the Promoter engaged in eleven matched trades to sell over two million of these Andiamo shares to the Matched Buyer in pre-arranged transactions that created the false appearance of high-volume trading at inflated prices.

4. In exchange for White's assistance, the Promoter paid White a significant portion of the Promoter's profits from his matched trades.

## VIOLATIONS

5. By virtue of the conduct alleged in this Complaint, White aided and abetted the Promoter's violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)], Sections 9(a)(1) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(1) and 78j(b)], and Rules 10b-5(a) and 10b-5(c) promulgated thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

6. Unless White is permanently restrained and enjoined, he will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint, and in acts, practices, transactions, and courses of business of a similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7. The Commission brings this action under the authority conferred upon it by Securities Act Section 20(b) [15 U.S.C. § 77t(b)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

8. The Commission seeks a final judgment: (a) permanently enjoining White from violating Securities Act Section 17(a) [15 U.S.C. §§ 77q(a)], Exchange Act Sections 9(a) and 10(b) [15 U.S.C. §§ 78i(a) and 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5]; (b) ordering White to disgorge the ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)]; (c) ordering White to pay civil money penalties, pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting White from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently prohibiting White from participating in any offering of a penny stock, pursuant to Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and (f) ordering any other relief the Court may deem just and proper.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. White, directly or indirectly, singly or in concert with others, has made use of the means or instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

10. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Among other things, the Matched Buyer placed the orders for the manipulative trades alleged herein by telephone from one or more locations in the Eastern District of New York, primarily in Nassau County.

## THE DEFENDANT AND THE RELEVANT ENTITY

11.     **White**, age 55, resides in Ionia, Michigan and was Andiamo's CEO from approximately February 3, 2014 until November 28, 2017, and then again beginning in approximately November 2018 until July 12, 2019.

12.     **Andiamo** is a Wyoming corporation with its principal office in Lansing, Michigan. Andiamo currently claims to be developing "mid-market smartphone devices." At various times, Andiamo has claimed to be involved, including through joint ventures, in several businesses, including a peppermint farm, a "hydrogen unit" to enhance truck performance, music production, a branding company, and products related to cellular telephone service. During the Relevant Period, Andiamo's common stock was quoted under the symbol "ANDI" on OTC Link, an interdealer quotation and trade messaging system operated by OTC Markets Group, Inc. During the Relevant Period, Andiamo's common stock met the definition of a "penny stock" under Exchange Act Section 3(a)(51) [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240. 3a51-1], in part because the stock traded below five dollars per share.

## FACTS

**A.     White Arranges for the Promoter to Obtain Heavily Discounted Andiamo Stock in Return for Kickbacks on Manipulative Matched Trades.**

13.     From January through June 2016, Andiamo's common stock traded between $0.000098 and $0.68 per share.

14.     During the same period, Andiamo's common stock was thinly traded: on more than half the trading days from January through June 2016, no shares of Andiamo common stock traded in the market.

15.     In approximately March 2016, a mutual acquaintance introduced the Promoter to the Matched Buyer.

4

16. In one or more conversations around that time, the Matched Buyer told the Promoter that he was a stock broker and that he and other brokers wanted to buy penny stocks from the Promoter for the brokers' customer accounts in exchange for a kickback. The Matched Buyer explained that the Promoter would have to pay the Matched Buyer a portion of the profits that the Promoter received from his sale of stock to the Matched Buyer. The Promoter understood that he and the Matched Buyer had the same incentive: trading shares of stock at artificially high prices and volumes for the benefit of the Promoter and the Matched Buyer but to the detriment of the Matched Buyer's unsuspecting brokerage customers.

17. The Matched Buyer further explained to the Promoter that the two of them would use pre-arranged matched orders to ensure that the Matched Buyer's buy orders were matched with the Promoter's sell orders.

18. In approximately May 2016, after the Promoter had agreed to this arrangement, the Promoter spoke to White about obtaining Andiamo stock for the Promoter's use in matched trades.

19. The Promoter and White agreed that White would arrange for the Promoter to buy certain Andiamo securities that were convertible to Andiamo common stock, such that the Promoter would obtain the common stock at a price heavily discounted from the then-prevailing market prices.

20. The Promoter explained that he planned to sell some of the resulting Andiamo stock to the Matched Buyer through matched orders and that the Promoter would have to kick back a portion of the proceeds of his sales to the Matched Buyer.

21. White and the Promoter agreed that, in exchange for White's assistance in obtaining the convertible securities, the Promoter would pay White half of the Promoter's net profits—after the Promoter paid the Matched Buyer his kickback and after any withheld taxes—from the Promoter's sales of the Andiamo common stock.

22. White demanded an up-front payment of $5,000 before he would begin participating, and the Promoter paid White $5,000 thereafter.

23. In approximately June 2016, White arranged for the Promoter to buy 3,000 shares of previously-issued Andiamo Series B Preferred Stock ("Preferred Stock") for $6,000 from an existing Andiamo shareholder.

24. On June 20, 2016, the Promoter then purchased 3,000 shares of Preferred Stock from the shareholder, who had bought the shares of Preferred Stock in approximately May 2014 for the same $6,000 price.

25. Each share of the Promoter's Preferred Stock could be converted into 2,000 shares of Andiamo common stock. The Promoter therefore obtained the right to receive six million shares of Andiamo common stock upon conversion: a price of $0.001 per share, based on the Promoter's $6,000 purchase price.

26. Meanwhile, Andiamo's common stock traded at a price of $0.19 per share—almost 200 times more than the Promoter paid—when the market closed that day, on June 20, 2016.

27. Nine days later, on June 29, 2016, White approved the Promoter's conversion of half of his Preferred Stock, or 1,500 shares, to three million shares of Andiamo common stock.

28. About one week later, on July 7, 2016, White signed a corporate resolution authorizing Andiamo's issuance of those three million free-trading shares of common stock to the Promoter.

    **B.    The Promoter Makes Two Matched Trades and Kicks Back Some of His Profits to White, Who Arranges for the Promoter to Obtain More Shares.**

29. On Monday, July 18, 2016, trading in Andiamo common stock opened at a price of $0.25 per share.

30. On or about July 18, 2016, the Promoter and the Matched Buyer arranged by telephone for the Matched Buyer to place an order to buy 10,000 shares of Andiamo common stock

6

at $0.27 per share and for the Promoter to place an order to sell 1,000 shares of Andiamo common stock at approximately the same price, to ensure that the Matched Buyer's buy order would be fulfilled by the Promoter's sell order. The Promoter and the Matched Buyer placed their orders by telephone, and the Matched Buyer did so from a location in the Eastern District of New York.

31. On July 18, 2016, the Promoter sold 1,000 shares of Andiamo common stock to the Matched Buyer at the pre-arranged price of $0.27 per share.

32. That day, trading in Andiamo common stock closed at a price of $0.25 per share.

33. Two days later, on July 20, 2016, trading in Andiamo common stock opened at $0.22 per share.

34. On or about July 20, 2016, the Promoter and the Matched Buyer arranged by telephone for the Matched Buyer to place an order to buy 25,000 shares of Andiamo common stock at $0.26 per share and for the Promoter to place an order to sell 25,000 shares of Andiamo common stock at approximately the same price, to ensure that the Matched Buyer's buy order would be fulfilled by the Promoter's sell order. The Promoter and the Matched Buyer placed their orders by telephone, and the Matched Buyer did so from a location in the Eastern District of New York.

35. On July 20, 2016, the Promoter sold 25,000 shares of Andiamo common stock—60% of the total volume of Andiamo shares traded that day—to the Matched Buyer at the pre-arranged price of $0.26 per share.

36. The Promoter profited from these sales of his Andiamo common stock to the Matched Buyer and paid White a significant portion of the net profits from the matched trades.

37. On August 8, 2016, White, as Andiamo's CEO, approved the Promoter's conversion of the remaining 1,500 shares of Preferred Stock to three million shares of Andiamo common stock.

38. The same day, White signed a corporate resolution authorizing Andiamo's issuance of those three million free-trading shares of common stock to the Promoter.

C.  **The Promoter Makes Five More Matched Trades and Kicks Back Some of His Profits to White.**

39. From August 8 through 31, 2016, the Promoter and the Matched Buyer arranged for the Promoter to place five more orders to sell Andiamo shares and for the Matched Buyer to place five more corresponding orders to buy Andiamo shares, as described below. The Promoter knew that his and the Matched Buyer's corresponding orders would be placed at substantially the same time, at substantially the same price, and for substantially the same number of shares and would therefore be matched. In each case, the Promoter and the Matched Buyer placed their orders by telephone, and the Matched Buyer did so from a location in the Eastern District of New York. The following chart summarizes the trades, described below in more detail.

| Transaction Date | Matched Transaction: Number of Shares Promoter Sold to Matched Buyer | Transaction Price (Pre-Arranged by Promoter and Matched Buyer) |
|---|---|---|
| August 8, 2016 | 72,000 shares | $0.049 per share |
| August 9, 2016 | 74,500 shares | $0.049 per share |
| August 30, 2016 | 100,000 shares | $0.025 per share |
| August 30, 2016 | 75,000 shares | $0.02 per share |
| August 31, 2016 | 94,136 shares | $0.037 per share |

40. On August 8, 2016, trading in Andiamo common stock opened at $0.05 per share and fell to an intra-day low price of $0.041 per share.

41. The same day, the Promoter sold 72,000 shares of Andiamo common stock—40% of the total volume of Andiamo shares traded that day—to the Matched Buyer at a pre-arranged price of $0.049 per share.

42. The next day, on August 9, 2016, trading in Andiamo common stock opened at $0.041 per share.

8

43. That day, the Promoter sold 74,500 shares of Andiamo common stock—approximately 50% of the total volume of Andiamo shares traded that day—to the Matched Buyer at a pre-arranged price of $0.049 per share.

44. A few weeks later, on August 30, 2016, trading in Andiamo common stock opened at $0.0275 per share and fell to an intra-day low price of $0.019 per share.

45. That day, the Promoter sold 100,000 shares of Andiamo common stock to the Matched Buyer at a pre-arranged price of $0.025 per share and another 75,000 shares of Andiamo common stock to the Matched Buyer at a pre-arranged price of approximately $0.02 per share. Together, these two trades constituted approximately 33% of the total volume of Andiamo shares traded that day.

46. The next day, on August 31, 2016, trading in Andiamo common stock opened at $0.025 per share and fell to an intra-day low price of $0.01 per share.

47. That day, the Promoter sold 94,136 shares of Andiamo common stock—almost 30% of the total volume of Andiamo shares traded that day—to the Matched Buyer at a pre-arranged price of $0.037 per share.

48. The Promoter profited from his sales of Andiamo shares to the Matched Buyer and paid White a significant portion of the net profits from these matched trades.

    **D.    White Meets the Promoter and the Matched Buyer in Person, and They Discuss Making Larger Matched Trades.**

49. On September 7, 2016, White met the Promoter and the Matched Buyer at a restaurant in Manhattan to discuss expanding their matched trades in Andiamo stock.

50. The Matched Buyer made clear to White that Andiamo as a company did not "really matter" to the Matched Buyer "as long as there [are] sufficient shares to be sold" and "the price is high enough to get you something."

51. The Matched Buyer told White: "Let's say hypothetically you're looking for $30,000 a month…we can liquidate $100,000 worth of stock because you got to get 30 points,…I got to get 25 for me, and I got to take care of brokers. And that's only said at this table."

52. White agreed: "I would love to do that…. I think I understand where you're going to go at price-wise and I know what we have stock-wise…and that won't raise any red flags."

53. The Matched Buyer explained that, if regulators started asking questions, White would have to have Andiamo issue press releases as a cover story to explain the spikes in the trading volume and prices of Andiamo shares:

> We have to make sure we don't raise any red flags, because we're going from zero to a hundred…at these low price[s] and the amount of shares we're going to be selling are pretty significant and the chart's going to go, go, go, go, and…FINRA [the Financial Industry Regulatory Authority, a self-regulatory organization] or anybody else comes knocking on the door, we just…need them to have everything like you said, you've got your file, you've got your press releases of what's going on, because the flip side of that is FINRA'll call you, the brokers that I'm using they have compliance officers that monitor what they're doing, I have a network of guys in different places…and…I need to take care of them because if they get hurt, I'm done…. I just need that cover of the press releases, I don't care what it is…something's happening, something out there to give them, why did you buy this, why did you buy all these shares, [in] this discretionary account.

54. The Matched Buyer next explained that he needed to monitor the brokers he was working with to make sure they did not sell the stock and cause the price to drop: "I need to keep track of these guys…. We need to make sure the price goes up, we need to make sure these guys aren't selling."

55. The Matched Buyer noted that they would have to continue "to coordinate the buying and the selling, just as we've been doing."

56. The Matched Buyer then turned to the Promoter and asked whether he would continue to play his role as the matched trades grew larger:

> I don't know who will be the point person, if, [the Promoter], you'll continue to be the point person, but we need to make sure that we're taking you out of

10

> your stock, and you know what I mean, so that needs to be done carefully. And I don't know, would you continue to spearhead once we go into the…several hundred thousand dollar amounts, million dollar amounts, whatever?

57. The Matched Buyer next touted to White the recent success the Matched Buyer and the Promoter had had with smaller matched trades: "We've been doing some very small amounts just to do the logistics. We've been matching each other, and it's worked out perfectly for these small amounts…. My guy will bid, they'll offer."

58. A few days after the meeting, on September 12, 2016, trading in Andiamo common stock opened at $0.039 per share and fell to an intra-day low price of $0.01 per share.

59. That day, the Promoter sold 80,000 shares of Andiamo common stock—approximately 33% of the total volume of Andiamo shares traded that day—to the Matched Buyer at a pre-arranged price of $0.038 per share. The Promoter and the Matched Buyer placed their orders by telephone, and the Matched Buyer did so from a location in the Eastern District of New York.

60. The Promoter profited from his sale of Andiamo shares to the Matched Buyer and paid White a significant portion of the net profits from this matched trade.

61. On September 27, 2016, a few weeks after White's meeting with the Matched Buyer and the Promoter, White had Andiamo issue a press release announcing that Andiamo's purported joint venture partner "recently participated in a Reddit Ask Me Anything (AMA) discussion" on the discussion website reddit.com.

**E.  White Arranges for the Promoter To Obtain More Discounted Shares, and the Promoter Makes Matched Trades Again and Kicks Back Profits to White.**

62. Ten days later, on October 7, 2016, the Promoter entered into a purchase agreement to buy 30,000 shares of Preferred Stock from an existing Andiamo shareholder for $2,000. Each share of Preferred Stock was again convertible to 2,000 shares of Andiamo common stock.

63. White signed the purchase agreement as Andiamo's chairman and CEO.

64. Eleven days later, on October 18, 2016, White approved the Promoter's conversion of all 30,000 Preferred Stock shares to 60 million shares of Andiamo common stock.

65. That day, White also signed a corporate resolution authorizing Andiamo's issuance of 60 million shares of free-trading common stock to the Promoter.

66. From November 17 through 22, 2016, the Promoter and the Matched Buyer arranged for the Promoter to place three large orders to sell Andiamo shares and for the Matched Buyer to place three corresponding orders to buy Andiamo shares, as described below. The Promoter knew that his and the Matched Buyer's corresponding orders would be placed at substantially the same time, at substantially the same price, and for substantially the same number of shares and would therefore be matched. In each case, the Promoter and the Matched Buyer placed their orders by telephone, and the Matched Buyer did so from a location in the Eastern District of New York.

67. On November 17, 2016, trading in Andiamo shares opened at a price of $0.0042 per share.

68. That day, the Promoter sold 478,800 shares of Andiamo common stock—almost 40% of the total volume of Andiamo shares traded that day—to the Matched Buyer at a pre-arranged price of approximately $0.0045 per share.

69. On November 21, 2016, Andiamo shares traded at prices ranging between $0.0032 and $0.0045 per share.

70. That day, the Promoter sold 402,146 shares of Andiamo common stock—28% of the total volume of Andiamo shares traded that day—to the Matched Buyer at a pre-arranged price of $0.0045 per share.

71. The next day, on November 22, 2016, Andiamo shares again traded at prices ranging between $0.0032 and $0.0045 per share.

72. That day, the Promoter sold 600,000 shares of Andiamo common stock—almost 50% of the total volume of Andiamo shares traded that day—to the Matched Buyer at a pre-arranged price of $0.0045 per share.

73. The Promoter profited from his sales of Andiamo shares to the Matched Buyer and paid White a significant portion of the net profits from these matched trades.

**F.     White Tries to Arrange Matched Trades Directly with the Matched Buyer.**

74. On December 1, 2017, more than a year later, shares of Andiamo common stock traded at a much lower price of $0.0001 per share.

75. Approximately sixty days later, on February 2, 2018, Andiamo common stock traded at prices between $0.0265 and $0.035 per share—a price 350 times higher than two months before.

76. On February 2, 2018, White spoke to the Matched Buyer by telephone.

77. White told the Matched Buyer that he had left Andiamo and "sold it" but that he still had 300 million shares and that the share price had "gone through the roof."

78. White explained his understanding that he could not legally sell more than 35 million of his shares before February 28, 2018, but explained that he wanted to sell more shares before then to the Matched Buyer if they could find a way to do so:

> [Y]ou've got a Pink Sheet [stock] that's at $0.03 [per share]. Who knows where it will be 30 days from now?…60 days ago it was at $0.0001 [per share] …. If there's something we can do with my affiliate shares, then great…. I know I can do 1%…so I can easily deposit 35 million of them, which obviously is a nice chunk of change, but if there's something we can do with the whole lot, I'd much rather do that and…be done.

79. The Matched Buyer asked White: "Timing-wise, you're looking to find a home for that stock?"

80. White replied, "Yeah, either the 35 million…or the whole 300 million, if you have a way that you can do that. Again, I know what the rules are, and I know what the rules are," and then laughed.

81. White made clear that he wanted to sell his shares to the Matched Buyer well before February 28: "I'd like to do it obviously as quick as possible because once I hit the end, the 30 days, I can do them all in a regular account, assuming I can get them in somewhere…. I'd like to do speed…."

## FIRST CLAIM FOR RELIEF
### Aiding and Abetting Violations of Securities Act Sections 17(a)(1) and 17(a)(3)

82. The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 81.

83. The Promoter, directly or indirectly, singly or in concert, in the offer or sale of securities and by use of the means or instruments of transportation or communication in interstate commerce or the mails, knowingly or recklessly has: (i) employed devices, schemes or artifices to defraud or (ii) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities, in violation of Securities Act Sections 17(a)(1) and 17(a)(3) [Section 15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

84. White knowingly or recklessly provided substantial assistance to the Promoter with respect to the Promoter's violations of Securities Act Sections 17(a)(1) and 17(a)(3).

85. By reason of the foregoing, White is liable, pursuant to Securities Act Section 15(b) [15 U.S.C. § 77o(b)], for aiding and abetting the Promoter's violations of Securities Act Sections 17(a)(1) and 17(a)(3) and, unless enjoined, White will continue to aid and abet violations of Securities Act Section 17(a).

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 9(a)(1)

86. The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 81.

87. The Promoter, directly or indirectly, singly or in concert, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange or any member of a national securities exchange, for the purpose of creating a false or misleading appearance of active trading in any security other than a government security, or a false or misleading appearance with respect to the market for any such security: (1) effected transactions in such security which involves no change in beneficial ownership thereof; or (2) entered an order or orders for the sale of such security with the knowledge that an order or orders of substantially the same size, at substantially the same time, and at substantially the same price, for the purchase of such security has been or will be entered by or for the same or different parties, in violation of Exchange Act Section 9(a)(1) [15 U.S.C. § 78i(a)(1)];

88. White knowingly or recklessly provided substantial assistance to the Promoter with respect to the Promoter's violations of Exchange Act Section 9(a)(1).

89. By reason of the foregoing, White is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting the Promoter's violations of Exchange Act Section 9(a)(1) and, unless enjoined, White will continue to aid and abet violations of Exchange Act Section 9(a).

## THIRD CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b)
### and Rules 10b-5(a) and 10b-5(c) Thereunder

90. The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 81.

91. The Promoter, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by use of the means or instrumentalities of interstate commerce,

15

or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly has: (i) employed devices, schemes, or artifices to defraud or (ii) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, in violation of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) thereunder [17 C.F.R. §§ 240.10b-5(a) and 240.10b-5(c)].

92. White knowingly or recklessly provided substantial assistance to the Promoter with respect to the Promoter's violations of Exchange Act Section 10(b) and Rules 10b-5(a) and 10b-5(c) thereunder.

93. By reason of the foregoing, White is liable pursuant to Exchange Act Section 20(e) [15 U.S.C. § 78t(e)] for aiding and abetting the Promoter's violations of Exchange Act Section 10(b) and Rules 10b-5(a) and 10b-5(c) thereunder and, unless enjoined, White will continue to aid and abet violations of Exchange Act Section 10(b) and Rule 10b-5.

**PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining White and his agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them, from future violations of Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 9(a) and 10(b) [15 U.S.C. §§ 78i(a) and 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering White to disgorge all ill-gotten gains he received directly or indirectly, with prejudgment interest thereon, as a result of the alleged violations;

### III.

Ordering White to pay civil money penalties under Securities Act Section 20(d) [15 U.S.C. § 78t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently prohibiting White from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 78t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

### V.

Permanently prohibiting White from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

## VI.

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
August 22, 2019

LARA S. MEHRABAN
ASSOCIATE REGIONAL DIRECTOR
Gerald A. Gross
Preethi Krishnamurthy
Eric M. Schmidt
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)
Krishnamurthyp@sec.gov